**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ORLANDO LOPEZ,
*Petitioner-Appellant*,

v.

TRENT ALLEN,<sup>*</sup> Acting Warden of Salinas Valley State Prison,
*Respondent-Appellee.*

No. 19-16606

D.C. No.
3:17-cv-03390-
WHA

OPINION

Appeal from the United States District Court
for the Northern District of California
William Alsup, District Judge, Presiding

Argued and Submitted December 7, 2021
San Francisco, California

Filed September 2, 2022

Before: Susan P. Graber and Daniel P. Collins, Circuit
Judges, and Jennifer Choe-Groves,<sup>**</sup> Judge.

---

<sup>*</sup> William Muniz is no longer the warden of Salinas Valley State Prison and is automatically substituted in this case by his successor, Acting Warden Trent Allen. Fed. R. Civ. P. 25(d).

<sup>**</sup> The Honorable Jennifer Choe-Groves, Judge for the United States Court of International Trade, sitting by designation.

Opinion by Judge Choe-Groves;
Dissent by Judge Graber

**SUMMARY***

**Habeas Corpus**

The panel affirmed the district court's denial of Orlando Lopez's habeas corpus petition challenging his California conviction for multiple crimes resulting from a shooting at a backyard barbecue.

Lopez raised several ineffective assistance of counsel claims under *Strickland v. Washington*, 466 U.S. 688 (1984), and the panel applied AEDPA deference to the state habeas courts' denial of relief.

Lopez argued that trial counsel was ineffective for failing to consult, appoint, and introduce evidence at trial from an expert on firearms and firearms acoustics. The prosecution's theory of the case was that two shooters, Paul Braden and Lopez, participated in the shooting both using shotguns. Lopez argued that an expert could have created reasonable doubt as to Lopez's guilt by providing testimony that the different sounds described by witnesses suggested that the second shooter did not use a shotgun, which would have pointed towards Kevin Stone as the second shooter because the evidence showed that he carried a .22 caliber rifle. Taking as true that trial counsel failed to consult with an

---

*** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

expert at all, the panel held that even assuming that this failure fell below an objective standard of reasonableness, it did not create the necessary prejudice to warrant relief.

Lopez argued that trial counsel was ineffective for failing to introduce expert testimony on the behavior of chronic methamphetamine users, which would have demonstrated that Stone was prone to impulsive and violent acts and that his testimony was unreliable. Noting that Stone's drug addiction and criminal history were made known during the trial, the panel held that it was not objectively unreasonable for the state habeas court to conclude that trial counsel's conduct was not constitutionally deficient and that any error that might have occurred did not create sufficient prejudice to call into question the outcome of the case.

Lopez argued that trial counsel was ineffective for failing to use Stone's prior inconsistent statements to impeach Stone and Sergeant Clements. The panel held that a reasonable jurist could conclude that trial counsel's decision to not impeach Stone and Sergeant Clements with the prior statements was not objectively unreasonable, and that the state court could reasonably conclude that there is not a reasonable probability that the outcome of the proceedings would have been different if trial counsel had more forcefully attempted to impeach them.

Lopez argued that trial counsel was ineffective for failing to introduce evidence of the respective heights of those involved in the shooting. The panel held that even if trial counsel's failure to address the respective heights fell below professional standards, a reasonable jurist could conclude that the outcome of the trial would not have been different if trial counsel had done so.

Lopez argued that trial counsel was ineffective for failing to request a jury instruction on the need to corroborate accomplice testimony. The panel held that a reasonable jurist could conclude that any error by counsel in failing to request such an instruction was harmless and did not create sufficient prejudice to meet the *Strickland* standard.

Lopez argued that the cumulative impact of trial counsel's individual deficiencies was sufficiently prejudicial to warrant habeas relief. The panel held that because Lopez failed to establish multiple errors of constitutional magnitude, there can be no accumulation of prejudice amounting to a denial of due process or meeting the *Strickland* standard.

Dissenting, Judge Graber wrote that Lopez's trial counsel provided ineffective assistance by failing to consult with and failing to introduce evidence from an expert in firearm acoustics, that no fairminded jurist could reasonably conclude that there was no prejudice, and that the California courts' conclusion to the contrary unreasonably applied *Strickland*.

## COUNSEL

Matthew Dirkes (argued), Boersch & Illovsky LLP, Oakland, California; Dylan Schaffer, Kerley Schaffer LLP, Oakland, California; for Petitioner-Appellant.

Arthur P. Beever (argued), Deputy Attorney General; Peggy S. Ruffra, Supervising Deputy Attorney General; Jeffrey M. Laurence, Senior Assistant Attorney General; Rob Bonta, Attorney General; Office of the Attorney General, San Francisco, California; for Respondent-Appellee.

**OPINION**

CHOE-GROVES, Judge:

Petitioner Orlando Lopez, a state prisoner, appeals the district court's denial of his petition for habeas corpus brought pursuant to 28 U.S.C. § 2254.  Petitioner asserts that the California state court unreasonably applied *Strickland v. Washington*, 466 U.S. 688 (1984), in determining that he did not receive ineffective assistance of trial counsel.  We disagree and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Petitioner was convicted of multiple crimes resulting from a shooting at a June 18, 2011 backyard barbecue.  Eight days prior to the shooting, a fight occurred at a high school graduation ceremony involving Petitioner's brother, Leonardo Lopez;[1] Josh Gamble; Joseph Armijo; and a group called the "Avenue Boyz."  During the fight, Leonardo struck Gamble in the eye.  Tensions remained high during the week following the fight.

On or around June 14, 2011, Petitioner attended a party at the home of Leonardo and Leonardo's then-girlfriend. During the party, Anthony Gaston brought a shotgun to the home, which he left between some boxes on the porch with the intention of retrieving the weapon later.  Petitioner was standing next to Leonardo when Gaston asked Leonardo for permission to leave the gun.  Gaston testified that he did not see the shotgun again after leaving it at Leonardo's home.

---

[1] For clarity, Orlando Lopez will be referred to throughout as "Petitioner" and Leonardo Lopez will be referred to as "Leonardo."

On the day of the shooting, a graduation party was held at Leonardo's home. Members of the Avenue Boyz, Paul Braden, and Petitioner were in attendance. During the party, Braden argued with Ross Sparks and a woman named Crystal Pearls over the phone. Ross Sparks was Gamble's cousin. Witnesses to the conversation testified that they overheard Braden say, "Let's meet up and handle this," and "I'll kill you. I'll kill your family." Petitioner was also involved in the conversation and was described by witnesses as "pretty irritated" and agitated and overheard attempting to arrange a place to fight. A series of aggressive text messages were also exchanged in which the sender identified himself as "Nano," a nickname used by Petitioner. Ross Sparks claimed that he called the sender, recognized Petitioner's voice, and heard Petitioner threaten to "bash me and my family's face in with the lead pipe that his brother hit [Gamble] in the face with." After the telephone and text message exchanges, a group discussed the possibility of fighting Ross Sparks.

Petitioner and Braden left the party and returned with a black shotgun wrapped in a sweatshirt. Braden then took the gun into a garage and removed the weapon's stock with a saw. Petitioner was present for the gun's alteration. After modifying the weapon, Braden made several statements suggesting his intent to use the gun, including "I didn't bring this gun to Clearlake for nothing. Let's go use it," "I'm bored, let's go shoot somebody," and "I didn't bring my gun for nothing, we need to go do this." Braden also expressly stated his desire to "[w]alk down to [Ross Sparks'] home and start shooting them." Petitioner was present for these statements.

At approximately 7:00 p.m., a man named Kevin Stone received a series of text messages from Petitioner's phone

number asking for a ride and stating that he had "a lick" and "straps."[2]  When the party disbanded between 9:30 p.m. and 10:00 p.m., Stone and his girlfriend picked up Petitioner and Braden.  Braden was carrying the shotgun wrapped in a sweatshirt when he left the party.  Stone testified that Petitioner was carrying "something similar" to Braden's gun.  One witness testified that Petitioner "wasn't holding anything" when he left the party.

Trial testimony established that Stone was a methamphetamine addict and dealer.  Stone admitted that he used methamphetamines frequently and that, on the day of the shooting, he drank multiple alcoholic beverages.  After picking up Braden and Petitioner, Stone retrieved a .22 caliber rifle from his girlfriend's apartment.

On the same evening, a backyard barbecue was held at Ross Sparks' home.  Some participants from the earlier graduation fight attended the barbecue.  Stone drove Petitioner and Braden to the area of Ross Sparks' home and the men entered a neighbor's backyard.  The yards were separated by a six-foot-tall wooden fence.  Between 10:30 p.m. and 10:45 p.m., gunshots were fired from the fence area into Ross Sparks' yard.  Witnesses described seeing muzzle flashes from a notch in the top of the fence and a gap in the fence created by two missing boards.  The shooting resulted in the death of a four-year-old child and injuries to five other people.  After the shooting, police observed holes in the wall of Ross Sparks' home consistent with 9-shot and 15-shot buckshot.  They also recovered three

---

[2] Stone explained at trial that a "lick" is slang for getting something for nothing, such as committing a robbery, and "straps" is slang for firearms.

expelled shotgun shells that an expert opined had previously been cycled through the same gun.

Stone was interviewed three times following his arrest. The first interview occurred on July 1, 2011 with Sergeant Clements and Detective Alvarado of the Clearlake Police Department. During the interview, Stone did not state whether Petitioner or Braden had a gun when they were picked up from Leonardo's home. He identified only Braden as having fired shots into Ross Sparks' yard. A second interview of Stone was conducted on November 3, 2011 and involved Sergeant Clements, Lake County District Attorney Anderson, and Stone's attorney. Stone again only identified Braden as a shooter. Unlike his earlier statement, Stone claimed that Petitioner also had a shotgun that he was given by Leonardo and that he observed Petitioner pass through the fence. Stone told the interviewers that he was unsure if Petitioner had fired the shotgun. A third interview of Stone was conducted on May 15, 2012 with District Attorney Anderson and Stone's attorney. During the third interview, Stone continued to claim that both Petitioner and Braden had shotguns and that Braden fired into Ross Sparks' yard. Stone's account changed from the prior interviews in that he stated that Petitioner and Braden both had shotguns when they were picked up from Leonardo's home and that he only observed Petitioner stepping away from the fence and could not tell if Petitioner stepped through the fence. Prior to trial, Stone entered into a plea agreement with the prosecution and testified against Braden and Petitioner. As part of the agreement, he pled no contest to accessory to murder after the fact, conspiracy to commit robbery, and possession of a firearm by a prohibited person. The agreement reduced Stone's potential sentence from life in prison to roughly ten years of incarceration.

At trial, after disclosing the plea agreement and his immunity, Stone testified that Petitioner and he had exchanged text messages on the day of the shooting in which Petitioner asked Stone if he was interested in "pulling a lick" and claimed to have "straps." Stone also testified that Braden fired several rounds from a shotgun over the fence and that he observed Petitioner holding a shotgun, but never witnessed it being fired. Stone admitted that his earlier claim that he saw Petitioner stepping through the fence was based on the preliminary hearing testimony of others, not his own recollection of events. Despite this clarification, Stone's prior account was reiterated during the testimony of Sergeant Clements.

Descriptions of the shooting provided by other witnesses varied considerably. The area around the fence was dark and many of the witnesses conceded to being intoxicated or otherwise impaired at the time of the shooting. Some witnesses testified that the shooting lasted a few seconds. One witness believed the shooting to have lasted for several minutes. Some of the witnesses described the firearms used during the shooting as having different sounds. Other witnesses described the shots as sounding similar to one another. Two witnesses testified that they could not perceive a difference in acoustics because they were in shock and their ears were ringing after the first shot. Two witnesses attributed the sounds that they described to differences in ammunition rather than differences in weapons.

Petitioner was convicted of one count of first-degree murder, five counts of attempted murder, six counts of assault with a firearm, two counts of mayhem, and one count of discharging a firearm at an occupied dwelling. He was sentenced to a prison term of 311 years to life. Petitioner and Braden appealed their convictions to the California

Court of Appeal.   The state appellate court reversed
Petitioner's first-degree murder conviction under *People v.
Chiu*, 325 P.3d 972 (Cal. 2014), *superseded by statute on
other grounds as stated in People v. Lewis*, 491 P.3d 309,
313 n.3 (Cal. 2021),**[3]** ordered that the sentences for mayhem
be stayed, and affirmed the remaining judgment.  *People v.
Lopez*, No. A136253, 2016 WL 634651 (Cal. Ct. App. Feb.
17, 2016) (unpublished).

Petitioner also filed a petition for habeas corpus with the
California Court of Appeal, raising arguments of ineffective
assistance of counsel.   The court denied the petition by
summary order on the same day the direct appeal was
resolved.   One justice dissented, concluding "that [Lopez]
has articulated a prima facie case for relief concerning his
claim of ineffective assistance of counsel based on trial
counsel's failure to present testimony from a firearms expert
regarding firearms acoustics, warranting issuance of an order
to show cause."   Petitioner subsequently filed a petition for
habeas corpus with the California Supreme Court, which
denied the petition summarily.

Petitioner filed a federal habeas petition under 28 U.S.C.
§ 2254 with the United States District Court for the Northern
District of California.   The district court denied the petition,
and Petitioner filed a timely notice of appeal.   We remanded
to the district court to determine whether to grant a certificate
of appealability, and the district court denied the certificate
after concluding that "reasonable jurists would not 'find the
district court's assessment of the constitutional claims
debatable or wrong.'"   We proceeded to grant a certificate of

---

**[3]** The court found that it was possible that the jury improperly based
its verdict on that count on the natural and probable cause doctrine of
aiding and abetting.

appealability on the issue of "whether trial counsel rendered ineffective assistance, including whether counsel was ineffective for failing to obtain a firearms expert to testify on firearms acoustics."

## STANDARD OF REVIEW

We review the district court's dismissal of a habeas petition de novo. *Gulbrandson v. Ryan*, 738 F.3d 976, 986 (9th Cir. 2013). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies because the petition was filed after April 24, 1996. *Woods v. Sinclair*, 764 F.3d 1109, 1120 (9th Cir. 2014). Under AEDPA, federal courts may grant a writ of habeas corpus only if the state court's adjudication of claims on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court defined the "benchmark for judging any claim of ineffectiveness" as "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. To prevail on a claim of ineffective assistance of counsel, Petitioner must establish that his counsel's performance was constitutionally deficient and that the deficiency prejudiced the defense. *Id.* at 687. Federal habeas review is highly deferential to the state courts and a petition should only be granted to correct "extreme malfunctions in the state criminal justice systems." *Greene v. Fisher*, 565 U.S. 34, 38 (2011) (citation omitted). Relief is warranted only when "the state court's ruling on the claim

being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

## DISCUSSION

Petitioner raises several ineffective assistance of counsel claims based on: (1) trial counsel's failure to consult and introduce the expert testimony of a firearms and firearms acoustics expert; (2) trial counsel's failure to introduce expert testimony on the behavior of chronic methamphetamine users; (3) trial counsel's failure to impeach Stone and Sergeant Clements with Stone's prior inconsistent statements; (4) trial counsel's failure to introduce evidence of the respective heights of those involved in the shooting; (5) trial counsel's failure to request a jury instruction on the need to corroborate accomplice testimony; and (6) the aggregate failure to attempt any of the foregoing actions during his representation of Petitioner. We are not persuaded by any of the arguments raised.

## A. *Firearms and Firearms Acoustics Expert*

Petitioner's initial argument is that trial counsel was ineffective for failing to consult, appoint, and introduce evidence at trial from an expert on firearms and firearms acoustics. The prosecution's theory of the case was that two shooters, Paul Braden and Petitioner, participated in the shooting both using shotguns. Two pieces of evidence were offered in support of Petitioner having a shotgun during the shooting. The first was Anthony Gaston's testimony that Petitioner knew that a single-action shotgun was stored on the porch of Leonardo's home, and the shotgun went missing after Gaston left it there. The second was Stone's testimony

that he saw Petitioner with a shotgun at the scene of the shooting. Petitioner argues that an expert could have created reasonable doubt as to Petitioner's guilt by providing testimony that the different sounds described by witnesses suggested that the second shooter did not use a shotgun. That would have pointed towards Stone as the second shooter, because the evidence showed that he carried a .22 caliber rifle.

Because the California Court of Appeal and the California Supreme Court both summarily denied Petitioner's habeas petition, we must apply AEDPA deference to their conclusion that Petitioner did not state a prima facie case for relief. *See Cullen v. Pinholster*, 563 U.S. 170, 188 n.12 (2011); *Nunes v. Mueller*, 350 F.3d 1045, 1054 (9th Cir. 2003). In doing so, "we assume that the factual allegations in [Petitioner's] [state] habeas petition are true." *Reis-Campos v. Biter*, 832 F.3d 968, 973 (9th Cir. 2016). Accordingly, we take as true that Petitioner's trial counsel failed to consult an acoustics expert at all. Even assuming that this failure fell below an objective standard of reasonableness, it did not create the necessary prejudice to warrant habeas relief.

In support of his petitions in both the state and federal courts, Petitioner offered the declaration of Ben Tisa, a firearms expert, which concludes, based on the accounts of witnesses, that the second gun used during the shooting was a .22 caliber rifle carried by Stone. Witness accounts of the shooting varied considerably regarding the number of shots fired, the sounds of the weapons, and the duration of the event. Though multiple witnesses provided accounts of the shooting, Tisa relies primarily on the testimony of only four people: Ross Sparks, Josh Gamble, Andrew Sparks, and Ian Griffith. In his analysis, Tisa cherry-picks details provided

by these witnesses and largely ignores conflicting facts. For example, Tisa relies on a statement made by Ross Sparks during a preliminary hearing in which Ross Sparks stated that he believed one of the weapons to be a lower-sized rifle or pistol. Tisa does not acknowledge that at trial Ross Sparks testified that he believed both weapons to have been shotguns using different types of ammunition. Similarly, Tisa discusses Andrew Sparks' recollection of the number of shots fired and the location of the shooters, but does not acknowledge that Andrew Sparks attributed the difference in sound to the types of ammunition used and testified that he was certain that the guns were both shotguns.

Tisa's declaration suffers from multiple weaknesses that would have been readily apparent to a jury and exploitable by opposing counsel. Tisa does not acknowledge the considerable discrepancy in testimony regarding the sounds of the weapons, the number of shots fired, and the duration of the shooting. The declaration is largely silent as to the fact that multiple witnesses testified to being impaired by drugs, alcohol, darkness, or the loud sound of the initial shot. Tisa also fails to address whether any acoustic differences observed by the witnesses might be attributable to different types of ammunition, as was suggested by witnesses during the trial. Some of these problems in the witness testimony were noted by trial counsel in his closing statement.

The opinions in the declaration that are less dependent on witness testimony are also open to scrutiny. Tisa opines that a single-action shotgun was unlikely to be the weapon used because it could not have been fired more than once during the timeframe of the shooting. It is unclear, however, how long the shooting lasted because witness testimony ranged from a few seconds to three minutes. Regardless,

even if Petitioner were only able to fire a single shot, it would have been enough to warrant conviction.

Tisa also discounts the possibility of a single-action shotgun being used, because he noted that expended shell casings consistent with a single-action shotgun were not found after the shooting. This opinion fails to consider the possibility that Petitioner collected and removed any expended shell casings from the scene. In light of Tisa's observation that the slowness of a single-action shotgun is the result of expended shell casings requiring manual ejection, this possibility would be reasonable.

Because Tisa's declaration is conclusory, lacks consideration of contrary evidence, and fails to address counterarguments that are readily apparent, a reasonable jurist would not be compelled to find its absence from trial sufficiently prejudicial.

Furthermore, the jury at trial was presented with considerable evidence to challenge Stone's partially incriminating testimony, in which he asserted that Petitioner had a shotgun during the shooting event. The jury was made aware of Stone's drug use, criminal history, prior inconsistent statements, and motive to lie. Trial counsel emphasized these points to the jury during his closing statement. The jury was also aware that Petitioner had a possible motive to participate in the shooting and that Petitioner involved Stone in the crime by inviting him to participate in a robbery and claiming to have guns. Considering these facts, a reasonable jurist could conclude that there is not a reasonable probability that the outcome of the proceedings would have been different if the testimony of an expert had been presented.

B. *Methamphetamine Expert*

Petitioner argues that the prosecution relied heavily on the testimony of Stone and that trial counsel had an obligation to highlight evidence that might have suggested Stone was the second shooter.  He specifically points to trial counsel's failure to present expert testimony on the behavioral impact of Stone's chronic methamphetamine use. Petitioner asserts that such testimony would have demonstrated that Stone was prone to impulsive and violent acts and that his testimony was unreliable.

An attorney's complete failure to investigate and offer evidence in support of defense theories may be constitutionally deficient, *see Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995); however, an attorney is not required to offer evidence that is unnecessary or redundant, *see Bonin v. Calderon*, 59 F.3d 815, 837–38 (9th Cir. 1995) (recognizing that a reasonable attorney would not provide witness declarations or undertake the expense of requiring witnesses to travel to merely reiterate facts already supported by substantial evidence).  Stone's drug addiction and criminal history were made known during the trial.  On direct examination, Stone conceded that his drug use at the time of the shooting was "pretty bad" and "pretty much controlled [his] life."  He also admitted to consuming two Tilts—an alcoholic energy drink—in the hours leading up to the shooting.  Trial counsel emphasized Stone's drug use, likely intoxication, and criminal conduct during his closing statement.  In light of these facts, it was reasonable for the California court to conclude that trial counsel's strategic determination to forego the use of an addiction expert was not objectively unreasonable.

Furthermore, Petitioner has not demonstrated that he suffered prejudice from trial counsel's choice to not present

testimony on Stone's drug use. As the Supreme Court of California has recognized, "[t]he effect of drugs, while certainly a proper subject of expert testimony, has become a subject of common knowledge among laypersons." *People v. Yeoman*, 72 P.3d 1166, 1218 (Cal. 2003). Even the expert presented by Petitioner in support of his habeas petition characterized the association between alcohol and violent crime as "well known" in his declaration. The common knowledge that drug and alcohol use can impair decision making or lead to violent acts would have been known to the jurors, regardless of whether such facts were reinforced by an expert's opinion or specific scientific data. It was reasonable for the state habeas court to conclude that trial counsel's conduct was not constitutionally deficient and that any error that might have occurred did not create sufficient prejudice to call into question the outcome of the case.

C. *Witness Impeachment*

Petitioner contends that trial counsel's failure to use Stone's prior statements to impeach Stone and Sergeant Clements constituted ineffective assistance of counsel. Certain details provided by Stone during his three pre-trial interviews and in his testimony at trial were inconsistent, including whether Petitioner possessed a weapon during the shooting and passed through the gap in the fence. Petitioner argues that trial counsel's decision to not address these inconsistencies weakened his ability to discredit Stone's unfavorable testimony and prejudiced the defense.

Trial counsel's strategies, including the treatment of witnesses, are entitled to deference on review. *Brown v. Uttecht*, 530 F.3d 1031, 1036 (9th Cir. 2008). And because we view the state court's resolution of that question only through the lens of AEDPA, our review is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123

(2009). The record suggests that trial counsel considered Stone to be a mixed witness, offering testimony that was both favorable and unfavorable to Petitioner. During his cross-examination of Stone, trial counsel elicited from Stone a statement that he did not believe that Petitioner fired a firearm and that he was "very certain" that Petitioner "was not shooting" during the incident. Trial counsel also referenced the changing details of Stone's account, noting that it was only after receiving a plea deal that Stone claimed that Petitioner had a gun during the shooting. These inconsistencies were raised again during trial counsel's closing statement. Trial counsel also stressed that Stone consistently stated that Braden was the only person he observed shooting into Ross Sparks' yard. Considering these facts, a reasonable jurist could conclude that trial counsel's decision to not impeach Stone and Sergeant Clements with Stone's prior inconsistent statements was not objectively unreasonable.

The decision to not impeach Stone and Sergeant Clements with Stone's prior inconsistent statements was also not sufficiently prejudicial. As previously noted, the jury was well aware of Stone's drug addiction, criminal history, and motivation to lie, which were stressed by trial counsel during closing statements. The jury was also aware that Stone's account of the events surrounding the shooting had changed. After Sergeant Clements testified that Stone had stated in an interview that he had seen Petitioner "coming back through an opening in the fence," Stone himself effectively impeached that prior statement by testifying that it had been based on the testimony of others at the preliminary hearing. Because the jury was in a position to weigh the testimony of Stone, the state habeas court could reasonably conclude that there is not a reasonable probability that the outcome of the proceedings would have been

different if trial counsel had more forcefully attempted to impeach Stone or Sergeant Clements.

## D. *Heights of Suspects*

Petitioner argues that trial counsel rendered ineffective assistance by not introducing evidence regarding the respective heights of Braden, Stone, and himself. Gamble described the individual shooting over the fence as about six feet tall and the individual shooting through the gap in the fence as slightly shorter than six feet tall. Petitioner contends that Braden is over six feet tall and that Petitioner is five feet, six inches tall. Trial counsel established that Stone is six feet tall.

Even if trial counsel's failure to address the respective heights of Braden, Stone, and Petitioner during trial fell below professional standards, it was not sufficiently prejudicial. The jury was provided with Petitioner's booking photo, which reflected his height. The jury was also able to directly observe the three men because Braden and Petitioner were tried jointly and Stone testified at the trial. The reliability of Gamble's estimation of the shooters' heights is questionable because Gamble conceded that he "wasn't paying that close attention" and that it was difficult to make out details of the shooter because of the darkness. Sparks also testified that it was difficult to see the shooters and opined that they appeared to be kneeling. Additionally, substantial other evidence was available for the jury to consider in determining the identities of the shooters. Because Petitioner did not suffer sufficient prejudice, a reasonable jurist could conclude that the outcome of the trial would not have been different if trial counsel had expressly raised the respective heights of Braden, Stone, and Petitioner.

E.  *Accomplice Testimony Jury Instruction*

Under California law, "[a] conviction [cannot] be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . ." Cal. Penal Code § 1111.  Petitioner contends that trial counsel should have obtained a pre-trial ruling on Stone's accomplice status, raised the need for corroboration during his opening and closing statements, requested a modification of pattern jury instruction 301,[4] and requested the use of pattern jury instruction 335.[5]

---

[4] "[Unless I instruct you otherwise,] (T/the) testimony of only one witness can prove any fact.  Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." Single Witness Testimony, Cal. Crim. Jury Inst. 301.

[5]    If the crime[s] of <insert charged crime[s]> (was/were) committed, then <insert name[s] of witness[es]> (was/were) [an] accomplice[s] to (that/those) crime[s].

You may not convict the defendant of <insert crime[s]> based on the (statement/ [or] testimony) of an accomplice alone.  You may use (a statement/ [or] testimony) of an accomplice that tends to incriminate the defendant to convict the defendant only if:

1. The accomplice's (statement/ [or] testimony) is supported by other evidence that you believe;

The lack of a jury instruction on corroboration of accomplice testimony was considered on direct appeal.[6] The

---

2. That supporting evidence is independent of the accomplice's (statement/ [or] testimony); AND

3. That supporting evidence tends to connect the defendant to the commission of the crime[s].

Supporting evidence, however, may be slight. It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime, and it does not need to support every fact (mentioned by the accomplice in the statement/ [or] about which the witness testified). On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect the defendant to the commission of the crime.

[The evidence needed to support the (statement/ [or] testimony) of one accomplice cannot be provided by the (statement/ [or] testimony) of another accomplice.]

Any (statement/ [or] testimony) of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that (statement/ [or] testimony) the weight you think it deserves after examining it with care and caution and in the light of all the other evidence.

Accomplice Testimony: No Dispute Whether Witness is Accomplice, Cal. Crim. Jury Inst. 335.

[6] It is unclear, however, from the opinion of the California Court of Appeal if Petitioner presented the question in the context of ineffective assistance of counsel. The appellate court's analysis addressed whether the trial court should have instructed the jury sua sponte. It is only in a

California Court of Appeal found that any error in not providing an instruction to the jury was ultimately harmless because there was ample corroborating evidence connecting Petitioner to the crime. Petitioner now argues that the California Court of Appeal was wrong because no evidence other than Stone's testimony supported Stone's claim that Petitioner had a gun at the scene of the shooting and was seen returning through the gap in the fence after the shooting.

"The corroborative evidence required by section 1111 'need not corroborate every fact to which the accomplice testified or establish the corpus delicti, but is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.'" *Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000) (quoting *People v. Fauber*, 831 P.2d 249, 273 (Cal. 1992)). It "may be slight, entirely circumstantial, and entitled to little consideration when standing alone." *People v. Valdez*, 281 P.3d 924, 974 (Cal. 2012). The jury was presented with evidence that Petitioner spent the day preceding the shooting with Braden, accompanied Braden to retrieve the shotgun, was present when Braden modified the shotgun, had a heated exchange with Ross Sparks in which Petitioner threatened Ross Sparks' family, had access to a shotgun, and accompanied Braden to the scene of the shooting. A reasonable jurist could conclude that any error by counsel in failing to request jury instructions concerning accomplice testimony was harmless and did not create sufficient prejudice to meet the *Strickland* standard.

---

footnote that the Court of Appeal addressed whether trial counsel's performance was deficient.

F. *Aggregate of Trial Counsel's Deficiencies*

Petitioner asserts that the cumulative impact of trial counsel's individual deficiencies was sufficiently prejudicial to warrant habeas relief. We have previously recognized that "the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair," *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citation omitted), and that the elements of *Strickland* can be satisfied through an accumulation of multiple instances of deficient performance, *see Fairbank v. Ayers*, 650 F.3d 1243, 1257 (9th Cir. 2011).

As discussed above, the state courts had reasonable bases for concluding that no error supported Petitioner's individual claims of ineffective assistance of counsel. The only instance in which an error did occur—the failure to provide a proper jury instruction—was reasonably deemed to be harmless. Because Petitioner has failed to establish multiple errors of constitutional magnitude, there can be no accumulation of prejudice amounting to a denial of due process or meeting the *Strickland* standard. *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir. 2012) ("There can be no cumulative error when a defendant fails to identify more than one error." (citation omitted)); *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible." (citation omitted)).

CONCLUSION

It is without question that trial counsel did not provide ideal representation, but flawless representation is not demanded by the Sixth Amendment. *Harrington*, 562 U.S. at 110. It is possible that the state courts might have reached different conclusions based on the evidence presented, but

our review is limited to the question of whether any reasonable argument exists to justify the state court's conclusion that trial counsel's performance did not violate *Strickland*.  Because such arguments do exist for the claims raised by Petitioner, we affirm the denial of Petitioner's habeas petition.

**AFFIRMED.**

GRABER, Circuit Judge, dissenting:

I respectfully dissent.  In my view, Petitioner's trial counsel provided ineffective assistance by failing to consult with and failing to introduce evidence from an expert in firearms acoustics.  Petitioner was prejudiced by counsel's failure.  Accordingly, the state court's denial of Petitioner's claim was an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984).

Eyewitnesses' testimony placed two shooters at the fence.  It is undisputed that Braden was one of the shooters.  Who was the second shooter?  Petitioner and Stone were both arrested in connection with the shooting.

The evidence at trial suggesting that Petitioner was the second shooter was largely circumstantial.  For example, on June 18, Petitioner had participated in Braden's angry phone exchange with Sparks and had sent threatening text messages to Sparks.  Petitioner was present both when Braden retrieved a shotgun and when Braden sawed the stock off it.  Finally, Petitioner was at the scene of the shooting with Braden and Stone.  But only one individual, Stone, put Petitioner at the scene with a firearm.  Specifically, Stone testified that Petitioner had a shotgun that

was similar to the one that Braden used, although he testified that he never saw Petitioner fire the shotgun.

But there also was strong circumstantial evidence that Stone was the second shooter. Before he picked up Braden and Petitioner, Stone spent several hours with his girlfriend. She testified that before picking them up, Stone had used methamphetamines and had consumed four caffeinated alcoholic beverages. Before going to the scene of the shooting, Stone retrieved his .22-caliber rifle. After the shooting, Stone fled and was on the run for two weeks with his girlfriend before he was arrested. Although police interviewed Stone three times before trial, he did not mention that Petitioner allegedly had a shotgun with him until the third interview, after which Stone entered into a plea agreement reducing his potential sentence from life in prison to roughly ten years of incarceration, in exchange for his agreement to testify against Braden and Petitioner.

The fact that Stone had a .22-caliber rifle at the scene, while Petitioner allegedly had a shotgun like Braden's, is crucial. One witness testified that the weapons used had two distinct sounds. The weapon in the gap of the fence produced a loud "boom," while the weapon fired from the top of the fence sounded like "a pap, pap . . . like a firecracker . . . ." Another witness provided similar descriptions. Sparks also testified that the firearms sounded different, one with a "big boom sound" and the other with a "lower sounding shot." Sparks' brother provided similar testimony.

Although the majority opinion merely assumes that trial counsel's performance was unreasonable, Maj. Op. at 13, the record makes clear that his performance was in fact deficient. Stone—the only witness who put Petitioner at the scene of the shooting with a firearm—testified that Petitioner

had a shotgun that was similar to Braden's. But Stone took to the scene of the shooting a firearm that differed from both Braden's shotgun and Petitioner's alleged shotgun: a .22-caliber rifle. Given how little solid evidence was available to differentiate between the theory that Stone was the second shooter and the theory that Petitioner was the second shooter, no fairminded jurist could reasonably conclude that counsel's failure to pursue the significance of the different sounds of the gunfire was within the range of competent performance.

The majority opinion contends that calling an expert on firearms acoustics would have undermined defense counsel's choice to attack the eyewitnesses' credibility. But trial counsel did rely on those witnesses' testimony to argue (albeit briefly) that the second shooter used a rifle like Stone's. An expert in firearms acoustics would have provided an objective explanation for Stone's being the second shooter, an explanation that was supported by the testimony of four witnesses. By contrast, Stone's testimony that Petitioner had a shotgun was uncorroborated, as well as intensely self-serving. Counsel chose to rely only on supposition to argue that the second shooter had a rifle. That choice was objectively unreasonable.

*Strickland*'s prejudice prong also is satisfied. The evidence corroborating Stone's account was circumstantial only, and the remaining evidence against Petitioner was weak. Thus, Stone's credibility was indispensable to the prosecution's case against Petitioner. The California Court of Appeal recognized that expert testimony might have tipped the scales:

> [A]lthough the weight of the evidence suggests the firearms sounded different, the jury was offered an explanation that was

consistent with both weapons being shotguns. No other evidence, *such as expert testimony*, contradicted that explanation.

*People v. Lopez*, No. A136253, 2016 WL 634651, at \*28 (Cal. Ct. App. Feb. 17, 2016) (unpublished) (emphasis added). One justice on the California Court of Appeal would have granted the petition on this issue. And, indeed, the expert presented in this proceeding would have opined that the witnesses' descriptions of the different sounds made by the two weapons fired are consistent with the firing of a .22-caliber rifle and a semi-automatic shotgun and are inconsistent with the firing of two shotguns. The majority opinion makes much of the fact that Petitioner's proffered testimony of Petitioner's expert of firearms acoustics conflicts with the opinions of some eyewitnesses about the nature of the firearms used in the shooting. Maj. Op. at 13–14. But the conflict between the expert opinion and lay opinions is precisely why the expert's testimony was indispensable to Petitioner's defense. Such expert testimony would have created a reasonable doubt about Petitioner's guilt.

On this record, no fairminded jurist could reasonably conclude that there was no prejudice. *See Hardy v. Chappell*, 849 F.3d 803, 826–27 (9th Cir. 2016) (concluding that the California Supreme Court had applied *Strickland* unreasonably in denying habeas relief when counsel had failed to present evidence that the State's key witness was the second killer). Accordingly, the California courts' conclusion to the contrary unreasonably applied *Strickland*.[1]

---

[1] Because the California courts unreasonably applied *Strickland* with respect to Petitioner's claim regarding firearms acoustics, I would

I would, therefore, reverse and remand.

---

reverse on that issue alone and would not reach Petitioner's remaining claims.