**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JOSEPH WILLIAM HART,

*Petitioner-Appellant*,

v.

RONALD BROOMFIELD, Acting Warden, California State Prison at San Quentin,

*Respondent-Appellee*.

No. 20-99011

D.C. No. 2:05-cv-03633-DSF

OPINION

Appeal from the United States District Court for the Central District of California Dale S. Fischer, District Judge, Presiding

Argued and Submitted January 22, 2024 Pasadena, California

Filed March 28, 2024

Before: Michelle T. Friedland, Lucy H. Koh, and Holly A. Thomas, Circuit Judges.

Opinion by Judge H.A. Thomas

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Joseph William Hart's 28 U.S.C. § 2254 habeas corpus petition in a case in which Hart was sentenced to death after a jury convicted him of the murder of Diana H. (known as Diane) and of the rape, sodomy, and forced oral copulation of Amy R.

Because the Supreme Court of California (CSC) did not offer reasoning when denying Hart's state habeas petition on the merits, Hart is required under the Antiterrorism and Effective Death Penalty Act to show there was no reasonable basis for the state court to deny relief.

Hart claimed that the prosecution suppressed, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), material impeachment evidence that could have been used to challenge the qualifications of Dr. Dewitt Hunter, a pathologist whom Riverside County contracted to perform an autopsy on Diane. The panel held that the district court appropriately rejected this claim because the CSC could have reasonably concluded that this evidence was not material.

Hart claimed that his trial counsel was ineffective for failing to challenge Dr. Hunter's qualifications and testimony. Affirming the district court's rejection of this claim, the panel wrote that Hart provided no reason to

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

conclude that a challenge to Dr. Hunter's qualifications would have resulted in the exclusion of his expert testimony or significant impeachment of his credibility; that a detective's report, even if it contradicted Dr. Hunter's testimony, did not harm Dr. Hunter's testimony; that trial counsel's decision not to investigate and impeach Dr. Hunter with Dr. Hunter's errors in previous trials did not prejudice Hart; and that Hart pointed to no evidence that trial counsel's presentation of his own expert would have contradicted Dr. Hunter's findings.

The panel addressed uncertified claims in a concurrently filed memorandum disposition.

## COUNSEL

Susel Carillo-Orellana (argued) and Lauren Collins, Deputy Federal Public Defenders; Cuauhtemoc Ortega, Federal Public Defender; Federal Public Defender's Office, Los Angeles, California; for Petitioner-Appellant.

Stephanie H. Chow (argued) and Lise S. Jacobson, Deputy Attorneys General; James W. Bilderback II, Senior Assistant Attorney General; Lance E. Winters, Chief Assistant Attorney General; Rob Bonta, Attorney General of California; Office of the Attorney General, San Diego, California; for Respondent-Appellee.

## OPINION

H.A. THOMAS, Circuit Judge:

In 1988, Joseph William Hart was tried and convicted of the murder of Diana H. (known as Diane), and of the rape, sodomy, and forced oral copulation of Amy R. Both Amy and Diane were 15-year-old high school students and friends whom Hart had lured to a rural area of Riverside County, California, before committing the crimes. At the sentencing phase of Hart's trial, the prosecution introduced uncontested evidence that Hart had committed several other sexual and physical assaults, as well as contested evidence that Hart murdered his 11-year-old niece, Shelah M., days before he was arrested. Hart was sentenced to death.

Hart now appeals the denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. First, Hart appeals the district court's rejection of his claim that the State suppressed evidence that could have impeached one of the prosecution's expert witnesses, Dr. Dewitt Hunter, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Second, Hart appeals the district court's rejection of his claim that his trial counsel was ineffective for failing to challenge Dr. Hunter's qualifications and testimony. The district court granted Hart a certificate of appealability with respect to both of these claims. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253. We affirm the district court's denial of Hart's petition.[1]

---

[1] In a concurrently filed memorandum disposition, we address six uncertified claims raised by Hart in this appeal.

## I.

On May 8, 1986, five days after the death of his niece, Shelah, Joseph William Hart was arrested on suspicion of the murder of Diane and the rape, sodomy, and forced oral copulation of Amy. Hart was charged with the crimes on August 27, 1986, and his trial began on January 11, 1988.

## A.

### 1.

Amy testified on behalf of the State, recounting the circumstances of the sexual assault and murder. Amy and Diane, then both 15 years old, were friends and classmates at La Sierra High School in Riverside, California. On March 24, 1986, Hart encountered the teens at a 7-Eleven convenience store, offering to pay one of them $1,000 to act as a lookout while he harvested marijuana from someone else's field. Although Hart wanted only one person to accompany him, at Diane's insistence, both she and Amy accompanied Hart. They got into Hart's car, and Hart drove off.

After driving for around 30 to 40 miles, Hart made a brief stop at a hardware store. Although he told Diane and Amy that he intended to purchase a hatchet, Hart ended up deciding not to buy one, claiming that the hatchet was too expensive and that he could use a screwdriver to cut the marijuana. Diane gave Hart her knife to use instead, but after Amy objected, Hart gave the knife back to Diane.

With Diane and Amy still in the car, Hart continued driving, eventually arriving at a dirt road. Hart told Amy to serve as a lookout while he and Diane went to gather marijuana. Hart and Diane went up a hill for a few minutes, came back, and then walked up another path out of Amy's

sight. Amy waited for around 15 to 20 minutes. She occasionally called out to Diane but heard no response.

Hart eventually returned without Diane. He told Amy that Diane was putting her feet in a spring, and that he needed help bringing back some bags. Amy followed Hart back up the path. While they were walking, Hart picked up a rock, claiming to have seen a snake. Amy asked Hart to give her the rock. Hart gave it to her but said that he would have to pick up another one, so Amy gave him the rock back.

It was around that time that Amy saw her friend Diane. Diane was lying face down on the ground, without any clothing on the bottom half of her body. Amy began to run away but Hart chased her and hit her on the back of the head with the rock, causing her to fall. He then started punching her, and they fell into a nearby gully. Amy asked Hart to let her talk to Diane, but Hart stated that Diane was unconscious. Amy asked Hart if he planned to kill her. Hart said he did not but warned Amy not to give him a reason to do it. As Amy continued to ask to speak to Diane, Hart told her to shut up, saying, "You're kind of funny, kid, I'm about to rape you and all you can do is think about your friend."

Hart then pulled up Amy's skirt and ripped off her panties from behind. Hart also ripped Amy's blouse open and ripped one of her bra straps. Hart told Amy not to look at him as he slapped his penis back and forth, stating, "It's hard for me to get it up after I just got it on with your friend." Hart then attempted to sodomize Amy. When that attempt failed, he instead placed his penis into her mouth. Hart eventually became erect and sodomized Amy. At one point he stated, "I've done this in people's houses and I've never killed anyone yet." Hart then grabbed Amy and took her further up the path. He picked up a jar of Vaseline and put

his penis into Amy's mouth again. Hart then applied the Vaseline to his penis and raped Amy.

After Hart raped her, Amy asked again if he was going to kill her. Hart said that he would knock her unconscious by hitting her on the back of the neck with a rock. Amy instead suggested that Hart tie her up and put her in a hole. Hart agreed and tied Amy up with her shirt and bra. Hart then walked over to Diane's body to look for Diane's knife, explaining that his fingerprints were on it. Hart lifted, then dropped Diane's arm. He returned to Amy, stating that he could not find the knife. Hart told Amy, "[L]ook, your friend was an asshole, she called me a few names, and I think she's dead."

Amy told Hart that he had no reason to kill her, and that she would never tell anyone about what happened because she would be too ashamed. Hart responded that he had to make her unconscious so he could get away. Amy then made up a story about how she used to be beaten by her father. Hart's demeanor toward her became more vulnerable and apologetic. He "changed into . . . another person."

Eventually, Hart dropped Amy off near the 7-Eleven, but warned her not to talk to the police or tell anyone where Diane was. Amy assured Hart that she would not tell anyone what had happened. Hart responded, "But that doesn't matter because by the time they pick me up, you know, I can get out before the, you know, sentencing. . . . Anyway, I've got two good friends that would do anything for me." Amy understood this as a threat.

After Hart left, Amy called her sister and told her what had occurred. The Riverside County Sheriff's Department then contacted Amy, and Amy helped Detectives Michael Lackie and Richard Moker locate Diane's body.

Hart was arrested on May 8, 1986, a few days after a detective spotted a car matching the description offered by Amy parked outside of Hart's mobile home. Evidence recovered from the crime scene linked Hart to the crimes, including a matching fingerprint obtained from a beer bottle left at the scene, and tire tracks that matched the tread pattern on Hart's car. Amy identified Hart in a lineup, dropping to the ground in fear when she saw him.

When Detective Lackie searched the area where Hart had sexually assaulted Amy and killed Diane, Lackie found no marijuana growing.

**2.**

The prosecution also called law enforcement witnesses to testify regarding their investigation of the crime scene. Criminalist James Hall testified that he collected loose hairs from Diane's body, including a pubic hair from Diane's thigh that was microscopically similar to Hart's, but not Diane's, hair. Hall did not find any seminal fluid on Diane's panties but found Diane's blood on her blouse. The prosecution then called Dr. Claire McArthur, who treated Amy after the sexual assault. Dr. McArthur testified that Amy had bruising on her upper back, abrasions and dirt on her knees, and injury to her perineum. Dr. McArthur also noted sand-type particles in Amy's vagina, strongly indicating penetration. On cross-examination, Dr. McArthur acknowledged that her report did not indicate evidence of sodomy, and that Amy had told her she was not sodomized when asked.

**3.**

The prosecution next called Dr. Dewitt Hunter, a pathologist whom Riverside County contracted to perform

an autopsy on Diane. Dr. Hunter testified that he found "major trauma" to Diane's "head and to the back," "minor trauma in various sites" over Diane's body, and "physical evidence consistent with possible sexual violation." Diane's body showed seven "impact-type lacerations," five of which were to the back of her head. These lacerations resulted in skull fractures, which Dr. Hunter explained would have required a "large amount of force" to create, and were likely created by a "rock or brick-like instrument." Dr. Hunter testified that three of the injuries could have independently resulted in death. He testified that Diane was likely unconscious from five minutes to an hour before dying, and that during this time she had inhaled vegetable material.

The prosecution asked Dr. Hunter if Diane had been sexually assaulted. Dr. Hunter testified that he saw "no physical evidence to indicate forceful entry." Nevertheless, he saw evidence of reddening around Diane's vagina, which he testified could have been caused by "forceful massage." Dr. Hunter noticed a "Vaseline-like substance" around Diane's vaginal introitus and inner thighs. He also observed abrasions and contusions on Diane's inner thighs, indicating that her legs may have been forcefully spread apart. Dr. Hunter testified that he believed Diane had been sexually assaulted, deeming his assessment "90 percent accurate."

**4.**

In his closing statement, the prosecutor explained that Hart could be found guilty of murder in the first degree if the jury believed that he committed the murder during a rape or attempted rape, or he committed the murder deliberately and with premeditation. But the prosecutor acknowledged that if the jury found that Hart lacked premeditation, and if he committed the murder during a sodomy or attempted

sodomy, but not a rape, then Hart would be guilty only of second-degree murder. The prosecutor argued that the jury could infer malice aforethought from the fact that Hart repeatedly struck Diane in the head with a rock, and premeditation from the fact that Hart appeared to have planned out the assault at least from the time he encountered Amy and Diane at the 7-Eleven. He also urged the jury to find that the murder was committed with a "special circumstance" of attempted or completed rape or sodomy. The prosecutor emphasized that Hart admitted to Amy that he had sexually assaulted Diane just before assaulting Amy.

In his closing argument, defense counsel conceded that Hart killed Diane during a sodomy or attempted sodomy, and that the killing was intentional. But counsel argued that the murder was not premeditated, and that Hart did not rape or attempt to rape Diane. Defense counsel emphasized that Dr. Hunter considered Diane's injuries to be "overkill." Defense counsel also noted that Hart stopped at multiple points along the drive and that he had given Diane back a knife that she had given him. The defense emphasized that the sexual assault swabs of Diane's body returned a negative result, that no semen was found on Diane's body or clothing, and that Dr. Hunter was not absolutely certain in his assessment that Diane had been sexually assaulted.

In his rebuttal, the prosecutor argued that Hart began his attempt to commit a rape as soon as he started talking to Diane and Amy at the 7-Eleven. The prosecutor argued that Hart specifically intended to commit rape, and not just sodomy. He expressed skepticism that the difference in criminal penalties between murder during the course of rape and murder during the course of sodomy would have influenced Hart's behavior. He noted that Hart ripped off Diane's bra, that he raped Amy, that petrolatum (found in

Vaseline) and pubic hair were found on Diane's body, and that abrasions and contusions on Diane's thighs indicated that Hart tried to force Diane's legs apart. Emphasizing Hart's statement that Diane was an "asshole, she called me some names and I killed her," the prosecutor urged the jury to infer that Hart killed Diane while she was resisting sexual assault. And the prosecutor argued that the murder was deliberate because Hart must have realized, between his multiple blows to Diane's back and head, that he was killing her.

After one morning of deliberations, the jury returned a verdict of guilty. The jury found Hart guilty of murdering Diane in the first degree, with the rape and sodomy special circumstances, meaning the murder was committed while Hart was engaged in the commission or attempted commission of both rape and sodomy. The jury also found Hart guilty of rape, sodomy, and forced oral copulation of Amy. The jury's special circumstances findings made Hart eligible for the death penalty.

**B.**

At the penalty phase of Hart's trial, the prosecution introduced evidence regarding five crimes Hart had committed against different women: two assaults in 1973, a rape in 1975, forcible oral copulation in 1975, and an attempted burglary in 1975. When Hart was arrested after the fifth incident, he admitted that he was attempting to commit sexual assault and that he had committed each of the previous offenses. As a result of these crimes, Hart was institutionalized at Patton State Hospital from 1975 until 1978.

The prosecution also introduced evidence that Hart had murdered his 11-year-old niece, Shelah, a few weeks after

he murdered Diane and sexually assaulted Amy, and a few days before he was arrested for those crimes. That evidence included testimony from Randall Gresham, Hart's former cellmate, who said that Hart had admitted that he had killed Shelah.

Hart's defense counsel introduced evidence and argument that Hart did not murder Shelah, including arguments attacking Gresham's credibility. Defense counsel also introduced mitigating evidence, including testimony about Hart's childhood and positive qualities.

After the parties gave their closing statements, the jury began its sentencing deliberations. During those deliberations, a juror requested a copy of Gresham's testimony, and the court provided a read-back of the testimony. On March 31, 1988, after two days and one morning of deliberations, the jury sentenced Hart to death.

## C.

### 1.

Hart's conviction and sentence reached the Supreme Court of California (CSC) on automatic appeal. *People v. Hart*, 976 P.2d 683, 695 (Cal. 1999). The CSC rejected each of Hart's claims. *Id.* Hart also filed multiple petitions for habeas corpus before the California courts: one in 1998, one in 2005, and one in 2007. Each petition was denied on the merits in a largely unreasoned order, and many of Hart's claims were also denied as successive or untimely.

### 2.

Hart filed a federal habeas petition on May 16, 2005. Hart received a stay of the case to complete state habeas review. After exhausting his claims in California courts, Hart

filed an amended federal habeas petition. Hart then filed his operative second amended federal habeas petition on March 10, 2008. On August 5, 2020, the district court rejected Hart's second amended petition, finding two claims unripe for review and denying the remainder.

Relevant here, the district court rejected Hart's guilt-phase *Brady* claims. Hart argued that the prosecution should have turned over evidence of errors that Dr. Hunter had made in autopsies at previous trials. The district court, however, found that this evidence was not available to the prosecution until it was compiled into memos and articles after Hart's trial. The district court further held that this evidence was not material, concluding that the errors Dr. Hunter made in previous cases were not relevant to his autopsy of Diane and would not have called into question the accuracy of his findings. The district court additionally rejected Hart's claim that counsel was ineffective for failing to object to Dr. Hunter's testimony, concluding that this objection would have been futile given the court's other findings about the testimony.

The district court granted a certificate of appealability with respect to Hart's claims regarding Dr. Hunter's testimony. Hart then appealed the district court's judgment with respect to those claims as well as several additional claims that the district court did not certify for appeal.

## II.

"We review *de novo* a district court's denial of a habeas corpus petition and review for clear error any factual findings made by the district court." *Jurado v. Davis*, 12 F.4th 1084, 1090 (9th Cir. 2021). "The decision by the district court to decline to order an evidentiary hearing is

reviewed for abuse of discretion." *Roy v. Lampert*, 465 F.3d 964, 968 (9th Cir. 2006).

## III.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we may grant habeas relief under 28 U.S.C § 2254 only if state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A decision is "contrary to clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" *Ochoa v. Davis*, 50 F.4th 865, 876 (9th Cir. 2022) (alterations in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000) (O'Connor, J., concurring)). "A state court's decision is an unreasonable application of clearly established federal law 'if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the [petitioner's] case.'" *Id.* (alterations in original) (quoting *Williams*, 529 U.S. at 413).

"When, as here, the [CSC] did not offer reasoning when denying [the petitioner's] state habeas petition on the merits, 'the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.'" *Bolin v. Davis*, 13 F.4th 797, 805 (9th Cir. 2021) (quoting *Harrington v. Richter*, 562 U.S. 86, 98 (2011)). "In that circumstance, we 'must determine what arguments or theories . . . could have supported[] the state court's

decision; and then [we] must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court.'" *Id.* at 805–06 (omission and alterations in original) (quoting *Richter*, 562 U.S. at 102).[2]

## IV.

Hart argues that the prosecution unconstitutionally suppressed material evidence that could have been used to challenge Dr. Hunter's qualifications. Because the CSC could have reasonably concluded that this evidence was not material, the district court appropriately rejected Hart's *Brady* claim.

## A.

Hart points to several memos drafted by Riverside County deputy district attorneys in which they complained about errors that Dr. Hunter had made in previous trials. Two of the memos are undated, and one was dated after Hart's trial. One memo described a trial in which Dr. Hunter gave inconsistent testimony regarding the victim's time of death

---

[2] Hart argues that we must assume the truth of the factual allegations in his petition because the CSC denied his claims on the pleadings. But we have explained that even when the CSC rejects a petition for failure to state a prima facie claim, a federal court must evaluate the "full merits of [the petitioner's] claims to assess whether the [CSC] could reasonably have denied habeas relief." *Montiel v. Chappell*, 43 F.4th 942, 957 n.13 (9th Cir. 2022) (citing *Cullen v. Pinholster*, 563 U.S. 170, 189–203 (2011)). Additionally, even when considering only whether a petitioner has stated a prima facie case, California courts conduct their own review of the trial record and do not credit wholly conclusory allegations or those based on hearsay. *See Bolin*, 13 F.4th at 806 n.2; *Waidla v. Davis*, 68 F.4th 575, 589 (9th Cir. 2023) (citing *People v. Madaris*, 175 Cal. Rptr. 869, 873 (Ct. App. 1981), *overruled on other grounds by People v. Barrick*, 654 P.2d 1243, 1250 (Cal. 1982)).

and whether the victim's skull had been fractured. During another trial described in that memo, Dr. Hunter gave a "100%" wrong answer regarding the victim's time of death, later backtracking with inconsistent and confusing testimony. A second memo characterized Dr. Hunter as careless, describing the trial in *People v. Seaton* (discussed further below), in which Dr. Hunter confused lacerations and incisions, and inaccurately stated that blood flowing from a dead person will not clot. A third memo described a case in which Dr. Hunter "reversed in his mind the locations of the damage to the victim's skull," resulting in an incorrect conclusion about the cause of death. After being shown autopsy photographs, Dr. Hunter only reluctantly—and even then, inconsistently—corrected himself.

Hart also points to a letter drafted by a representative from Damon Reference Laboratories on December 15, 1988—after Hart's trial—urging Riverside County not to award a contract to Dr. Hunter. The letter described a case in which Dr. Hunter incorrectly determined a cause of death was not homicide, when a second autopsy found that it was. The pathologist who conducted that autopsy described Dr. Hunter's work as a "very sloppy job." The letter also discussed a homicide trial in which Dr. Hunter wrongly insisted that there were photos taken with probes and was highly reluctant to correct his testimony.

Hart further points to January 1989 news articles printed in the *Riverside Press Enterprise* regarding Dr. Hunter's work for the County. These articles describe an investigation into a potential capital case in which the district attorney requested that Dr. Hunter not perform the autopsy because he was not board certified in forensic pathology. One article described an instance in which Dr. Hunter did not note in an autopsy that the woman's uterus had been removed, causing

insurance officials to question whether Dr. Hunter examined the right body.

Finally, Hart points to a declaration submitted by defense counsel in the case of *People v. Seaton*, 28 P.3d 175 (Cal. 2001). In support of a motion for a new trial, Seaton's counsel submitted a declaration describing Dr. Hunter's testimony in Seaton's trial. Dr. Hunter had testified that the victim was attacked in two locations, and that one could tell from the blood clotting and blood pattern that the victim survived the first attack but not the second. None of those conclusions was found in Dr. Hunter's autopsy report. Seaton's counsel thereafter consulted with another pathologist, who reviewed Dr. Hunter's testimony and autopsy, finding that the victim had certainly died at the first location, and that it was not possible to distinguish blood from a live or dead person through blood clotting. Seaton's counsel also deposed the Riverside County Coroner, who stated that Dr. Hunter had admitted some of his mistakes in a conversation with him around December 1988 or January 1989.

## B.

Under *Brady v. Maryland*, the government may not suppress evidence favorable to the accused "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *United States v. Alahmedalabdaloklah*, 76 F.4th 1183, 1229 (9th Cir. 2023) (quoting *Brady*, 373 U.S. at 87), *opinion amended and superseded*, -- F.4th --, 2024 WL 844755 (9th Cir. Feb. 28, 2024). This principle also prohibits suppression of evidence that could impeach a government witness's credibility. *Id.* (citing *Giglio v. United States*, 405 U.S. 150, 154–55 (1972)). "To establish a *Brady/Giglio* claim, a

defendant must show that: (1) the evidence at issue would have been favorable to the accused, either because it was exculpatory or impeaching; (2) it was suppressed by the prosecution, either willfully or inadvertently; and (3) it was material." *Id.*

"Evidence is material within the meaning of *Brady* 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding *would* have been different.'" *Id.* (quoting *Ochoa*, 16 F.4th at 1327). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence [the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Ochoa*, 16 F.4th at 1327 (alteration in original) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). If we determine that evidence is not material under *Brady*, we need not address the other elements of a *Brady* claim. *See Turner v. United States*, 582 U.S. 313, 323–24 (2017).

Hart argues that evidence impeaching Dr. Hunter is material because Dr. Hunter's testimony helped establish that Hart both raped Diane and intentionally killed her. But the CSC could reasonably have concluded that the impeachment evidence was not material because, even without Dr. Hunter's testimony, there was little likelihood the jury would not have found Hart guilty of first-degree murder with a rape or sodomy special circumstance. Hart argues that Dr. Hunter's testimony regarding the circumstances of Diane's death was "critical." But Hart also concedes that Diane's cause of death—multiple blows to the back of her head—"was not subject to serious dispute." In closing statements, the prosecution urged the jury to infer that Hart must have realized he was killing Diane while

repeatedly striking her on the back of her head. Because Hart does not dispute that Diane died from these blows, the prosecution's argument would still have been available even if Dr. Hunter's testimony had been discredited.

Nor would the exclusion of Dr. Hunter's testimony have undermined the prosecution's argument that Hart's plan to lure Amy and Diane to a remote area demonstrated premeditation. Indeed, as Hart acknowledges on appeal, some of Dr. Hunter's testimony arguably undermined the inference that Hart intended to kill Diane—including his characterization of Diane's injuries as "overkill," which could have suggested that Hart was motivated by a spontaneous impulse.

Hart also argues that Dr. Hunter's testimony that Diane had been sexually assaulted likely swayed the jury. But Dr. Hunter's testimony—in which he admitted some uncertainty—was far from the only evidence on which the jury might have relied in reaching its conclusions. The jury could have found that Hart attempted or committed sexual assault against Diane based on the facts that (1) foreign pubic hair and a "Vaseline-like substance" were found on Diane's body, (2) Diane's body was unclothed from the waist down, lying on top of her torn bra, when Amy saw it and when Diane's body was discovered by police, (3) Hart told Amy that he had "just got it on with [her] friend," and (4) Hart raped Amy and used Vaseline in doing so. When significant evidence other than a single witness's testimony supports the jury's verdict, a state court can reasonably find that evidence impeaching that witness is not material. *See Strickler v. Greene*, 527 U.S. 263, 293 (1999); *Rhoades v. Henry*, 598 F.3d 495, 504 (9th Cir. 2010) (finding no prejudice when an impeachable witness's testimony "was

not central to the prosecution's case in the same way that a key witness's testimony" could be).[3]

## C.

Hart also argues that the state court erred in resolving his *Brady* claim on an incomplete record. But "[a] state court's decision not to hold an evidentiary hearing does not render its fact-finding process unreasonable so long as the state court could have reasonably concluded that the evidence already adduced was sufficient to resolve the factual question." *Hibbler v. Benedetti*, 693 F.3d 1140, 1147 (9th Cir. 2012). Here, Hart provides no argument other than a conclusory assertion that the state court record was incomplete. And although Hart notes that he requested permission from the state court to supplement the record in his state habeas proceedings, these requests do not identify what additional evidence would be material to his claims. The state court record contained all the evidence discussed above, including Dr. Hunter's testimony and the impeachment evidence that Hart believes he should have received. For the reasons discussed above, the state court could have reasonably determined from the record that this evidence was not material.

## V.

## A.

A defendant's right to counsel has not been effectively vindicated if he can show "(1) constitutionally deficient

---

[3] Hart also argues that the district court, "and presumably the state court," erred in relying on *Seaton* to determine that the prosecution was unaware of this evidence regarding Dr. Hunter at the time of Hart's trial. But as we have explained, Hart has failed to demonstrate that this evidence was material, even if the prosecution knowingly suppressed it.

performance by counsel (2) that prejudiced the defense." *Washington v. Shinn*, 46 F.4th 915, 926 (9th Cir. 2022) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "To establish deficient performance, [the petitioner] must show that 'counsel's representation fell below an objective standard of reasonableness.'" *Id.* at 927 (quoting *Strickland*, 466 U.S. at 688). "To establish prejudice, [he] must show that there is 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694).

This "standard, although by no means insurmountable, is highly demanding." *Id.* at 926 (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986)). "Trial counsel's strategies, including the treatment of witnesses, are entitled to deference on review." *Lopez v. Allen*, 47 F.4th 1040, 1050 (9th Cir. 2022). "And because we view the state court's resolution" of the question whether a petitioner's counsel performed deficiently "only through the lens of AEDPA, our review" of that issue "is 'doubly deferential.'" *Id.* (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

Hart argues that his trial counsel was ineffective for failing to investigate and criticize Dr. Hunter's lack of certification in forensic pathology or rape trauma. But Dr. Hunter had been board certified in pathologic anatomy and clinical pathology since 1957, had conducted over 5,000 autopsies by the time of Hart's trial, and had testified in over 50 trials regarding his findings. Indeed, the California Court of Appeal had previously emphasized Dr. Hunter's extensive qualifications in another case. *See People v. Roehler*, 213 Cal. Rptr. 353, 361, 382 (Ct. App. 1985) (allowing the jury to rely on Dr. Hunter's testimony). Hart therefore provides no reason to conclude that a challenge to Dr. Hunter's

qualifications would have resulted in the exclusion of his expert testimony or significant impeachment of his credibility.

Hart next argues that his counsel should have impeached Dr. Hunter with Detective Lackie's report about the crimes. He asserts that Detective Lackie's report contradicted Dr. Hunter's testimony because the report gave no indication that Diane was sexually assaulted. But even assuming that there was a contradiction, this contradiction harmed Detective Lackie's credibility, not Dr. Hunter's. Detective Lackie acknowledged in his testimony that Dr. Hunter had made findings regarding sexual assault but explained that he had simply failed to include Dr. Hunter's findings in his own report. And although Detective Lackie acknowledged that his report had incorrectly indicated no trauma to Diane's vaginal or anal area, he testified that this was because he had misunderstood Dr. Hunter's findings. Detective Lackie's testimony therefore placed the blame for any inconsistencies on himself. And because this information was already before the jury, Hart's counsel was not ineffective for failing to raise it when cross-examining Dr. Hunter. *See Lopez*, 47 F.4th at 1051 (upholding a state court's finding of no prejudice when defense counsel failed to impeach a witness with information of which the jury was already aware).

Hart also argues that trial counsel should have discovered the errors that Dr. Hunter had made in previous trials and used those to impeach Dr. Hunter. But, as explained above, the CSC could have reasonably concluded that those errors were not material under *Brady*. And because "*Brady* materiality and *Strickland* prejudice are the same," *Gentry v. Sinclair*, 705 F.3d 884, 906 (9th Cir. 2013), trial counsel's decision not to investigate and impeach Dr. Hunter with his previous mistakes did not prejudice Hart.

Some of Dr. Hunter's testimony was in fact potentially helpful to Hart. For example, in his guilt-phase closing argument, Hart's counsel referenced Dr. Hunter's uncertainty regarding whether Diane had been sexually assaulted. Hart's counsel also pointed to Dr. Hunter's testimony that the killing blows were "overkill" to argue that Hart lacked premeditation or intent to kill Diane. Hart reiterates these points on appeal. The state court could reasonably have found that trial counsel was not ineffective for failing to question the credibility of a "mixed witness, offering testimony that was both favorable and unfavorable to Petitioner." *Lopez*, 47 F.4th at 1050. Such impeachment may well have harmed Hart's case.

Finally, Hart argues that trial counsel was ineffective for failing to present his own expert to contradict Dr. Hunter's findings. Yet, Hart points to no evidence that another expert would have done this. "[S]peculative assertions that more consultation with an expert could somehow have aided [counsel] in preparing his defense or in cross-examining [an expert witness] are unpersuasive and insufficient to establish prejudice." *Gallegos v. Ryan*, 820 F.3d 1013, 1035 (9th Cir. 2016).

**B.**

Hart also requests an evidentiary hearing for his ineffective assistance of counsel claim but makes no argument specific to this request. He has therefore forfeited the request. *See Cui v. Garland*, 13 F.4th 991, 999 n.6 (9th Cir. 2021) (finding a claim forfeited when the party made "no substantive argument" regarding the claim).

## VI.

For the reasons discussed above, the district court's denial of Hart's habeas petition is hereby **AFFIRMED**.